IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
--------------------------------------------------   :
BERTIN STEEL PROCESSING, INC.,                        :  CASE NO.  1:02 CV 1669
                                                      :
                                        Plaintiff     :
                                Counter-Defendant,    :  MEMORANDUM OF OPINION AND
                                                      :  ORDER ACCEPTING THE REPORT
                                                      :  AND RECOMMENDATION OF THE
                                        -vs-          :  MAGISTRATE JUDGE AND GRANTING
                                                      :  DEFENDANTS' MOTIONS FOR
                                                      :  SUMMARY JUDGMENT AGAINST THE
                                                      :  PLAINTIFF'S CLAIMS, WHILE DENYING
        UNITED STATES STEEL CORP, et al.,             :  THE DEFENDANTS' MOTIONS FOR
                                                      :  SUMMARY JUDGMENT ON THEIR
                                        Defendants    :  COUNTER-CLAIMS.
                                Counter-Plaintiffs.   :
--------------------------------------------------   :
```

UNITED STATES DISTRICT JUDGE LESLEY WELLS

Plaintiff, Bertin Steel Processing, Inc. ("Bertin") commenced this suit in state court,

which defendants removed on 23 August 2002, pursuant to 28 U.S.C. §§ 1441 & 1452.

(ECF #1).  On 30 September 2003, in its second amended complaint, Bertin Steel named

as defendants, United States Steel Corporation ("USX"), Kobe Steel, Ltd. ("Kobe"), and

Kobe Delaware, Inc. ("KDI"), seeking redress for fraud, breach of fiduciary duty and

apparent partnership liability. (ECF #46).  The gravamen of the complaint stems from

Bertin's allegations that Kobe and USX were the actual partners of USS/Kobe, a business

venture formed in 1989 with which Bertin had a contractual relationship for steel

processing.   As partners, Kobe and USX had a duty to disclose a pending merger of

USS/Kobe with another steel concern in 1999 that ended in bankruptcy for that concern

and for Bertin.  Alternatively, Bertin maintains that if Kobe and USX were not partners of

USS/Kobe then USS/Kobe's affirmative representations otherwise amounted to fraud upon which Bertin relied to its detriment.

Kobe, KDI, and USX answered, filing counterclaims against Bertin Steel seeking compensatory damages for the cost of defending the suit pursuant to Section 24.1 of the 1998 Processing Agreement ("1998 Agreement") between Bertin and USS/Kobe. (ECF # 60, 61, 62).

This case is currently before the Court on a summary judgment motion filed by USX (ECF # 71, 72), and a joint motion filed by Kobe and KDI (ECF # 74, 75). Bertin Steel filed its opposition to the motions for summary judgment (ECF # 92, 93), USX replied (ECF # 96), and Kobe and KDI filed a joint reply (ECF # 97).

On 12 May 2004, the Court referred defendants' summary judgment motions, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1, to Magistrate Judge Patricia A. Hemann for a Report and Recommendation ("R&R"). (ECF # 100). On 23 July 2004, Magistrate Judge Hemann issued an R&R recommending the Court grant defendants' motions for summary judgment as to Bertin Steel's actions and deny defendants' motions for summary judgment as to defendants' causes of action against the plaintiff. (ECF # 101). Bertin Steel subsequently filed objections to Magistrate Judge Hemann's R&R (ECF # 102) and defendants filed responses to plaintiff's objections (ECF # 103, 104).

Under Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1)(C), this Court reviews *de novo* the portion of the Magistrate Judge's report and recommendation to which specific objection was made. Upon review, this Court "may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge." 28

2

U.S.C. § 636(b)(1).  After a *de novo* review of the record, and for the reasons discussed

below, this Court accepts Magistrate Judge Hemann's Report and Recommendation.

Accordingly, the Court will grant defendants' motions for summary judgment regarding

Bertin Steel's actions, deny the defendants' motions for summary judgment on the

defendants' causes of action against Bertin Steel, and will dismiss all three claims of

plaintiff's complaint.

## I. FACTUAL BACKGROUND

The Court has gleaned the following facts from the record, construed in the light

most favorable to Bertin Steel, the party opposing the motion for summary judgment.

The Court has jurisdiction to hear this diversity claim, pursuant to 28 U.S.C. § 1332.

Bertin Steel is an Ohio corporation engaged in the business of steel processing.  (Second

Amended Complaint (the "Complaint") ¶ 1, 18).  USX is a Delaware corporation engaged

in the steel business.[1]  USS is a Delaware corporation engaged in the steel business and

was a division of USX Corporation.  (Affidavit of Robert M. Stanton, Esq. (the "Stanton

Aff.") ¶ 2).  Kobe Steel is a Japanese corporation engaged in producing steel, aluminum

and copper products.  KDI is a Delaware corporation and a subsidiary of Kobe Steel USA

Holdings Inc., which is a wholly owned subsidiary of Kobe Steel.  (Deposition of Tadashi

Takeuchi (the "Takeuchi Dep."), p. 72.).  Kobe/Lorain, Inc. ("Kobe Lorain") was an Ohio

corporation and a wholly owned subsidiary of KDI, and was in the business of

---

[1]USX is the successor of USX Corporation.  (Complaint ¶2).

manufacturing and selling steel.  (Takeuchi Dep. p. 73).  USS Lorain Holding Company, Inc. (USS Holding") was a wholly owned subsidiary of USX.  (Complaint, ¶¶2,6; Affidavit of A. E. Ferrara, Jr. (the "Ferrara Aff.") ¶ 8).

### A.    The 1988 Operating Service Agreement.

Bertin Steel entered into an Operating Service Agreement with USS, a division of USX, beginning 28 December 1988, (the "1988 Agreement").  (1988 Operating Service Agreement, Defendants' Evidentiary Appendix; Deposition of Bernard D'Ambrosi, Sr. (The "D'Ambrosi, Sr. dep.") pp. 21-22).  The 1988 Agreement established the terms under which Bertin Steel performed processing services to carbon and steel bars manufactured by USS at its steel mill located in Lorain, Ohio (the "Lorain Mill").  Bertin Steel processed the material provided by USS at a building leased by USX, located in Wickliffe, Ohio and referred to by the parties as the "Wickliffe Crane Center."  (Complaint, ¶ 18; 1988 Agreement, p. 1; D'ambrosi, Sr. Dep., pp. 14, 20).

The 1988 Agreement detailed services performed by Bertin Steel and set forth the terms of the relationship between Bertin and USS, including the allocation of expenses, title to the equipment and products, and allocation of risk.  (1988 Agreement Articles 14-16, 18).  The 1988 Agreement expressly enabled USS to assign the contract while prohibiting Bertin from assigning or subletting any work to be performed under the Agreement without USS's prior written consent.  (Id. at Article 20).  The 1988 Agreement further enunciated Bertin Steel's relationship to USS as "solely that of an independent contractor," noting that:

4

> Nothing contained herein or any other documents comprising a part hereof shall be deemed to constitute or create a relationship or agency, joint venture, partnership or any relationship other than that as herein specified. . . .

(1988 Agreement, Article 25: Agency, Partnership and Joint Venture Disclaimer).  An integration clause in the 1988 Agreement limited terms and conditions to those stated in the agreement, and constrained the terms of modification by declaring that "no Agreement or understandings in any way modifying the terms or conditions herein stated shall be binding upon [USS] unless made in writing and signed by a duly authorized representative of [USS] stating that it is such a modification."  (1988 Agreement, Article 26).

### B.    The formation of USS/Kobe and the 1989 Specification.

During the first half of 1989 USS Holding and Kobe Lorain, both Ohio Corporations and wholly-owned subsidiaries, respectively of KDI and USX, formed USS/Kobe as a general partnership under the laws of the State of Ohio.  (Stanton Aff. ¶6).  USX transferred its Lorain Mill and related operations to USS/Kobe, including the Bar Business performed by Bertin under the 1988 Agreement.  (Complaint ¶19).  While USS Holding and Kobe Lorain were the only partners of USS/Kobe, (Ferrara Aff., ¶8; Plaintiff's Reply to Kobe Steel, Ltd's Counterclaim, ¶6 (ECF # 64)), Kobe, nevertheless, issued a press release announcing the formation of USS/Kobe on 3 July 1989 which represented the new venture as:

> An equal-partnership, joint-venture between Kobe Steel, Ltd. and USX Corporation, the largest steelmaker in the U.S. . . . A management Committee of six, equivalent to a board of directors, is in charge of

5

establishing policy for the new joint-venture company.  The committee is
made up of three people from Kobe Steel and three from USX.

(Bertin Opposition to Motion for Summary Judgment ("Bertin Opp."), Appendix 34, Exhibit

B).  USS/Kobe was, variously, referred to as a joint-venture between USX and Kobe in

USX's Form 10-K filing with the SEC (Bertin Opp., App. 23, p. 17), an arrangement

echoed in USX's 1989 Annual Report (Bertin Opp., App. 24), and press releases issued

from USX (Bertin App. 20) and Kobe (Bertin Opp., App. 34 Exh. C, D).

As a result of these and other representations, Bertin maintains that it reasonably

believed that USX and Kobe were the general partners for USS/Kobe, causing it to

detrimentally act in reliance upon those representations.[2]  While USS/Kobe was a joint

venture between USS Lorain and Kobe Lorain, Bertin further maintains that, nevertheless,

USX was the alter ego of USS Lorain while Kobe was the alter ego of Kobe Lorain.[3]

After USX transferred the Bar Business to USS/Kobe, Bertin and USS/Kobe

agreed to the terms of an Operating Service Contract Specification (the "1989

---

[2]Bertin maintains that Kobe was the sole practical source of control "regardless of
the undisclosed subsidiary insulation" represented by Kobe Lorain.  To substantiate its
argument, Bertin recalls that in its negotiations to add ultrasonic testing to its capabilities,
at USS/Kobe's request, the "Kobe representatives told Bertin that Kobe Steel in Japan
would have to approve the ultrasonic project." (Bertin Objections To Report and
Recommendation, citing B. D'Ambrosi, Jr. Dep. pp. 119-20).

[3]Bertin does not dispute the record evidence that Kobe Lorain and USS Lorain,
which it refers to, variously, as Kobe Holding and USS Holding were the general partners
of USS/Kobe.  (Bertin Opp. To Kobe and KDI, pp. 4-6; Bertin Opp. To USX, pp. 3-4).
Instead, Bertin maintains that "important decisions concerning USS/Kobe were made by
Kobe Steel in Japan," that the Lorain subsidiaries were merely shell holding companies
concealed in public statements, and these holding companies operated as alter egos of
Kobe and USX such that "Bertin's principals all firmly believed that USS/Kobe was a
partnership between USX and Kobe, right up until the time this lawsuit was filed."  (Bertin
Opp. To USX, p. 4) (citations omitted).

Specification"), issued under the 1988 Agreement on 14 August 1989. (D'Ambrosi, Jr. Dep., pp. 42-43, 44-45; Bilz Aff., ¶ 4, 5). In language which substantially mimicked the 1988 Agreement, which it amended and supplemented, the 1989 Specification set out the terms by which Bertin performed the processing services to USS/Kobe. The 1989 Specification continued to define Bertin as "solely . . . an independent contractor" in its dealings with USS/Kobe and disclaimed any other relationship, including but not limited to agency, joint venture, or partnership. (Bilz Aff., Exh. B, Art. 13.19). Bertin was equally constrained, as in its 1988 Agreement with USS, from assigning or subletting any services without USS/Kobe's prior written approval. (Id., Art. 13.17). Furthermore, the 1989 Specification harbored an "integration clause" prohibiting any changes in the terms and conditions binding USS/Kobe unless made in writing, signed by an authorized representative of USS/Kobe, and designating the modification as such. (Id., Art. 13.20).

Bertin represented that its relationship with USS/Kobe as predicated on elements of trust and confidence, in which the plaintiff operated as an extension of the manufacturing process within USS/Kobe. Bertin maintains that as the relationship developed over the course of ten years, "USS/Kobe routinely treated Bertin as an insider, sharing confidential information, and Bertin did the same . . . giving rise to a duty to disclose material facts." (Bertin Opp. To USX, p. 6). As instances of this emerging relationship of trust and confidence, Bertin points to several developments.

At the Wickliffe Crane Center, Bertin received semi-finished product from USS/Kobe, finished the process, and shipped the final product to USS/Kobe's customers. (Bilz Dep., p. 9, 10). Bertin serviced USS/Kobe with priority processing, "just in time"

7

delivery, quality tested the product and provided records for USS/Kobe.[4]  (Bilz Dep., pp. 10-11).  To facilitate the close coordination required, Bertin maintained access to the USS/Kobe computer system, entered shipping information directly, and utilized USS/Kobe paperwork in shipping the final product to USS/Kobe customers.[5]

As an additional indication of the hand-in-glove relationship between the two concerns, Bertin notes that USS/Kobe, initially, owned all of the manufacturing equipment at the Wickliffe Crane Center, but that as their business relationship progressed, Bertin purchased equipment so that the facility supported both Bertin owned and USS/Kobe owned equipment.  (Bilz Dep., pp.16, 18).  Bertin serviced all the equipment at the Wickliffe Center.  With regard to production, Bertin participated in weekly meetings at USS/Kobe, had access to USS/Kobe customer information, participated in negotiations and discussions with customers, and was provided confidential pricing and marketing information developed by USS/Kobe.  (B. D'Ambrosi, Jr. Dep. 18, 22, 23).

---

[4]Bertin also notes that USS/Kobe assigned a quality control person to "oversee the Bertin operation, and that person had an office at the Bertin facility."  (Bilz Dep. p. 11). While Bertin maintains that arrangement signifies the particularly close working relationship it had with USS/Kobe, it more reasonably indicates an arms-length business practice in which USS/Kobe gained assurance that product quality remained firmly in its hands rather than in Bertin's.  Such a designation could, for example, also be viewed as an indication that Bertin alone could not adequately maintain quality control over the final product.

[5]The USS/Kobe paperwork that Bertin utilized consisted of order confirmations, bills of lading and shipping documents, but not invoices or payment terms, which was handled by USS/Kobe.  (Bilz Dep. 14-15).

**C.    The 1998 Agreement between Bertin and USS/Kobe.**

In 1996, Bertin and USS/Kobe began a series of lengthy discussions which ultimately led to a restructuring of the arrangement under which Bertin provided processing services for USS/Kobe.  (D'Ambrosi, Jr. Dep., p. 48, App. 3, Exh. 8; D'Ambrosi, Sr. Dep., p. 53).[6]   The impetus for that restructuring was, according to Bertin, USS/Kobe's dissatisfaction with its ownership of the Wickliffe Crane Center which entailed a substantial hold-over rent penalty and assorted fixed costs.[7]  According to Bertin, USS/Kobe pushed the company hard to assume the transactions, while Bertin coupled the purchase of the Wickliffe Crane Center with the completion of the 1998 Agreement, which established guaranteed payments and a termination fee, as a means of shifting the risks.  (Bertin's Opp. App. 7, 9, 10; D'Ambrosi, Jr, Dep., pp. 54-55, 61-62).[8]

_____

[6]The parties agreed to a framework for the restructuring of their business relationship by letter, dated 23 August 1996.  ( D'Ambrosi, Sr. Depo., p. 52-54).

[7]After USS/Kobe and Weston Realty, Inc. Could not reach an agreed extension of the leases for the Wickliffe Crane Center that expired on 31 March 1995, USS/Kobe began paying a monthly hold-over penalty of $12,005.78 on 1 April 1995.
    Bertin also maintains that USS/Kobe was concerned with future liabilities associated with the Wickliffe Crane Center and wanted Bertin to assume the financial responsibility for the fixed costs such as buildings and utilities.  (Bertin Opp. App. 6, Letter 21 March 1997).  Bertin further represents that it was told that it would lose USS/Kobe's business if it refused to proceed with the transactions.  (D'Ambrosi, Sr. P. 67; S. D'Ambrosi p. 42).

[8]Bertin contends that USS/Kobe "coupled the long-term, guaranteed processing agreement with statements concerning Bertin's bright future with USS/Kobe, in order to convince Bertin that purchasing the Wickliffe Center and incurring all of the associated liabilities was a safe investment."  (Bertin Opp. at 8; App. 12).
    As an additional indication of USS/Kobe's assurances toward the arrangement, Bertin recounts a conversation between Sam D'Ambrosi of Bertin and Joe Kaczka of USS/Kobe over the liability limitations proposed in section 24.1 of the 1998 Agreement which prohibits Bertin from initiating a suit against the partners of USS/Kobe and allows

9

The parties negotiated terms and circulated a draft processing agreement by June of 1997.  (D'Ambrosi, Jr. Dep., p. 59).  After several more drafts, on 16 December 1998, Bertin and USS/Kobe entered into the 1998 Processing Agreement (the "1998 Agreement") which established the parties' relationship, going forward, and sets forth the terms under which Bertin performed processing services for USS/Kobe at the Wickliffe Crane Center.  ( D'Ambrosi, Sr. Dep., pp. 57-66, 73, Exh. 9, 10, 11, 12;  D'Ambrosi, Jr. Dep., pp. 57-63, 68-82, Exh. 23, 24, 25).[9]

--------------------------------------------------

suit only against USS/Kobe's assets.  USS/Kobe's counsel explained that such a provision was standard, while Mr. Kaczka responded: "come on guys, do you really think that U.S. Steel and Kobe would bankrupt this joint venture.  That's not going to happen so you don't have anything to worry about.  We've been in this thing for this much, what's the problem."  (D'Ambrosi, Jr. Dep., p. 85; Sam D'Ambrosi, Dep., pp. 75-76, 115).

[9]Bertin Steel memorialized the negotiation meetings that occurred on 24 June and 8 July 1998 in a prepared document which mapped out three separate possible scenarios for the rearrangement of the professional relationship between Bertin and USS/Kobe.  ( D'Ambrosi, Sr. Dep., App. 3, Exh. 11).  In that document, Bertin recounts the goals of the negotiation process:

> During the past three years USS/KOBE Steel Co. And Bertin Steel Processing, Inc. Have participated in a joint project to alter their current business relationship in a way which would benefit both parties while strengthening the working relationship enjoyed by both of these organizations during the past 10 years.  The goal of these discussions was to alter the current relationship in a way that would allow USS/KOBE Steel Co. To have its product processed by an independent quality supplier without maintaining any interest in the property housing Bertin's facility.  The discussions held during this period have produced three alternative methods to accomplish this goal.  These alternatives are presented in the pages that follow in the form of Scenarios.  The factual basis underlying these Scenarios may be summarized briefly as follows:
>
> Scenario 1: Bertin Steel Processing, Inc. purchases the property housing its facility, leases the equipment owned by USS/KOBE Steel Co. For a nominal fee.  USS/KOBE pays a monthly fee plus processing costs for its product in accordance with the price information enclosed.  This arrangement is memorialized in a five year processing agreement executed for the purpose of providing security for both parties.

Pursuant to the 1998 Agreement, Bertin agreed to purchase the Wickliffe Crane

Center and to execute an equipment purchase agreement to enable it to obtain the

necessary machinery to perform the services required of it by the 1998 Agreement.  The

1998 Agreement also structured the pricing and payment for Bertin's services and

specified which expenses in providing those services belonged to Bertin.  The substantial

fixed costs that Bertin assumed, under the 1998 Agreement, were balanced by the monthly

payments from USS/Kobe, sufficient to cover those fixed costs.  In addition, the 1998

Agreement provided a substantial termination fee to Bertin should USS/Kobe terminate

the agreement, the purpose of which, according to Bertin "was to reimburse [it] for the

costs incurred in acquiring the Wickliffe Crane Center, as well as covering the fixed costs

of Bertin's operation."  (Complaint, p. 7).

While substantially similar to the language of the 1988 Agreement and the 1989

Stipulation, the 1998 Agreement set the superceding terms and conditions for the

---------------------------

Scenario 2:  Bertin Steel Processing, Inc. purchases the property housing its facility, purchases the equipment owned by USS/KOBE Steel Co, obtains independent financing for this purchase.  USS/KOBE pays a monthly fee plus processing costs for its product in accordance with the price information enclosed.  This arrangement is memorialized in a five year processing agreement executed for the purpose of providing security for both parties.

Scenario 3:  Bertin Steel Processing, Inc. purchases the property housing its facility, purchases the equipment owned by USS/KOBE Steel Co, USS/KOBE Steel Co. finances said purchase.  USS/KOBE pays a monthly fee plus processing costs for its product in accordance with the price information enclosed.  This arrangement is memorialized in a five year processing agreement executed for the purpose of providing security for both parties.

11

relationship between Bertin and USS/Kobe.  Pertinent to the matter at hand, the parties

agreed to be constrained by the following Articles:

13.    <u>Termination</u>.

    13.1    Notwithstanding any provision to the contrary hereto, the following shall be events of default hereunder ("Events of Default"):

(B) if either party should file or consent to the filing of any petition in bankruptcy or for other relief under any bankruptcy law or laws for the relief of debtors, or be adjudicated insolvent, or be dissolved or liquidated, or make any assignment for the benefit of its creditors, or if a receiver or similar person should be appointed;

    13.5    If USS/KOBE elects to terminate this Agreement at any time for its sole convenience and in the absence of any Events of Default and provided that Processor is not in default of any of its obligations under this Agreement, USS/KOBE shall pay the Termination Fee set forth in Exhibit C hereto. USS/KOBE, at its sole option, may elect to pay the Termination Fee by continuing to pay the monthly installments or in lump sum fashion as set forth on Exhibit C hereto.

*    *    *    *

17.    <u>Assignability</u>.

    17.1    Neither this Agreement nor any rights hereunder shall be assigned, pledged, or otherwise encumbered or disposed of by Processor, nor shall any duty of Processor be delegated or subcontracted, whether in whole or in part, whether voluntarily or by operation of law, or otherwise without the prior written consent of USS/KOBE.  An "assignment" for this purpose shall include a change of Processor, whether directly or indirectly by virtue of a change of control of a parent company.

*    *    *    *

18.    <u>Relationship of the Parties</u>.

    18.1    The relationship of the parties is one between independent contractors. Neither Processor or USS/KOBE shall have any right, power or authority to act as agent or legal representative of the other, and neither party shall have any power to obligate or bind the other, or to make any representations,

12

express or implied on behalf of or in the name of the other in any manner or for any purpose whatsoever.  Nothing in this Agreement shall be construed to make either party hereto the agent, representative, partner or joint venturer of the other.

\*    \*    \*    \*

19.    <u>Integration; Severability</u>.

19.1    This agreement contains the entire understanding between the parties and supersedes all other agreements, representations, and warranties, express or implied, between the parties, except those expressly incorporated by reference herein.

\*    \*    \*    \*

20.    <u>Governing Law</u>.

20.1    This Agreement shall be governed and construed in accordance with the internal laws of the State of Ohio, without regard to the choice of law or conflict of law provisions in such jurisdiction.

\*    \*    \*    \*

23.    <u>Binding Effect</u>.

23.1    This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective permitted successors and assigns.

\*    \*    \*    \*

24.    <u>No Recourse to Partners</u>.

24.1    Bertin acknowledges that USS/KOBE is organized as a general partnership under the laws of the State of Ohio and that absent any agreement to the contrary, Bertin could, under certain circumstances, have limited recourse against the partners of USS/KOBE in connection with liabilities and obligation of USS/KOBE under the Agreement or relating to the work ("USS/KOBE Obligations").  Bertin hereby covenants and agrees (i) that it shall not bring, and Bertin will cause its subcontractors, materialmen and suppliers to refrain from bringing, any action against the general partners of USS/KOBE or any of their affiliates (other than USS/KOBE), employees, officers, directors or owners in connection with the USS/KOBE's Obligations and (ii) that the sole recourse of Bertin (including, with limitation, Bertin's

13

subcontractors, materialmen and suppliers) with respect to the USS/KOBE's Obligations shall be against the assets of USS/KOBE and not against the general partners of USS/KOBE or any of their affiliates (other than USS/KOBE), employees, officers, directors or owners.

(1998 Agreement, USX App. 3, Exh. 12, pp. 14-20).

The 1998 Agreement and related transactions closed on 16 December 1998.  By 14 January 1999, Bertin had purchased the Wickliffe Crane Center and associated equipment in the facility, and executed a release in favor of USS/Kobe for all of its liabilities arising under its leases of the Crane Center.  (Babcoke Dep. P. 103; Bertin Opp. App. 16).

**D.    The 1999 Merger of USS/Kobe with Republic Technologies International.**

Bertin contends that Kobe and USX were maneuvering to merge USS/Kobe with two subsidiaries of the Blackstone Group ("Blackstone") prior to the execution of the 1998 Agreement in December 1998.  (Bertin Opp. Pp 7-9).  Bertin points to a meeting held between the representatives of USX and Kobe on 28 August 1998 to discuss the possibility of merging USS/Kobe with another entity.  (Takeuchi dep., pp. 20-21). Additionally, Bertin remarks on a September, 1998 "contact" between Albert Ferrara of USX and David Stockman of Blackstone, ostensibly made to discuss a possible merger. (Ferrara Aff. ¶ 11-15).  Both USX and Kobe admit that some merger conversations had taken place, especially after Blackstone acquired control of two of USS/Kobe's principal

14

competitors in the steel bar processing market, Bar Technologies, Inc. ("BarTech") and
Republic Engineered Steels, Inc. ("Republic"), in September 1998.

USX concedes that by the late 1990s USS/Kobe was suffering "major financial
loses" as a result of the highly competitive bar business.  USS/Kobe's loses caused its
general partners to consider various means for improving the venture including "a strategic
alliance, a merger with other partners or a sale or closure of all or a part of USS/Kobe."
(Ferrara Aff., ¶ 9-10).

In an effort to improve USS/Kobe's market and financial posture, Mr. Stockman and
Mr. Ferrara had several telephone conversations between late November or early
December 1998 and February 1999, exploring the possibility of combining USS/Kobe's
and Blackstone's steel bar production efforts.  (Ferrara Aff., ¶ 14-17; Holcomb Aff., ¶ 10-
13).  These preliminary discussions culminated in a meeting on 24 February 1999, with Mr.
Stockman, Mr. Ferrara and Paul Wilhelm, Vice Chairman of USX, in which the parties
exchange detailed information as prelude to the start of negotiations for a possible merger
or combination.  (Ferrara Aff., ¶ 18-20; Holcomb Aff., ¶ 14).  USS/Kobe was not informed
of these conversations until after the 24 February 1999 meeting, when Mr. Ferrara sought
to obtain detailed operations and financial information for USS/Kobe's bar operations
from George Babcoke, President of USS/Kobe and Lewis Jones, Vice President of
Finance and Administration for USS/Kobe.  (Ferrara Aff., ¶ 21-22; Babcoke Aff., ¶ 7).

Kobe and USX maintain that the first actual negotiating meeting between the
parties did not occur until 8 March 1999, which marked the first of several "intense"
negotiating meetings between the parties.  These negotiations ultimately led to the signing

of a letter of intent on 12 April 1999, outlining the proposed merger of USS/Kobe, BarTech

and Republic into a new entity, Republic Technologies International ("RTI").  (Ferrara Aff., ¶

25-26, Exhibit E; Stanton Aff., ¶ 12-14).  The RTI transaction was not consummated until

13 August 1999, when USS/Kobe transferred its manufacturing assets and assigned the

1998 Agreement to RTI.  (Complaint ¶ 44; Babcoke Aff., ¶ 10; Bertin Opp. App. 35, 36,

Master Restructuring Agreement).

Bertin continued to perform processing services for the new entity RTI in

accordance with the 1998 Agreement.  (D'Ambrosi Dep., pp. 86-87).  Bertin assented to

RTI as the assignee of the 1998 Agreement, though Bertin maintains it had no choice but

to make the best of a worsening situation.  (B. D'Ambrosi Dep., pp. 110-11; S. D'Ambrosi

Dep., pp. 59).[10]  As matters did worsen, Bertin, nevertheless, continued to perform the

processing services for RTI, after RTI defaulted on the payments arrangements set forth in

the 1998 Agreement, and even after RTI filed its Chapter 11 bankruptcy case.[11]  Bertin did

not receive payment for those services.  (D'Ambrosi, Sr. Dep., pp. 92-93; D'Ambrosi, Jr.

Dep., pp. 110-11).  Bertin maintains that by the time RTI filed for bankruptcy and

disavowed the 1998 Agreement without paying the termination fee, the plaintiff's business

was no longer viable.  (Bertin Opp. P. 11).

_____

[10]Bertin and RTI entered into a Processor's Agreement effective 19 August 1999 to
provide services to inventory owned by RTI pursuant to the agreement between Bertin and
RTI dated 16 December 1998, the effective date of the 1998 Agreement.  (D'Ambrosi Sr.
Dep., App. 3, Exh. 14).

[11]RTI eventually filed for protection under Chapter 11 of the United States
Bankruptcy Code, Case No. 01-51117 (U.S. Bankruptcy Court, N.D. Ohio, Eastern
Division).

16

### III. ANALYSIS

In their summary judgment motions, USX, Kobe, and KDI assert they are entitled to judgment as a matter of law on all of Bertin's claims.  For each of Bertin's three claims – fraud, breach of fiduciary duty and apparent partnership liability –  this Court relates the Magistrate Judge's conclusions, identifies Bertin's objections, and conducts a *de novo* review on the law that touches and concerns the plaintiff's objections.

### A.    Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323;  see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir.1991) (moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir.1987)).  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed.R.Civ.P. 56(e)).  Thus, "[o]nce the moving

17

party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." <u>Talley v. Bravo Pitino Restaurant, Ltd.</u>, 61 F.3d 1241, 1245 (6th Cir.1995).  Read together, <u>Liberty Lobby</u> and <u>Celotex</u> stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50.  <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>see</u> <u>also</u> <u>Michigan Protection and Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 341 (6th Cir.1994) (marking as standard that the plaintiff must present "more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff").  Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position.  <u>Celotex Corp.</u>, 477 U.S. at 324.  Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"  <u>Hancock v. Dodson</u>, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted).

18

**B.     The Magistrate Judge's Report on Bertin's Claims for Fraud, Breach of
          Fiduciary duty, and Apparent Partnership Liability.**

The Magistrate Judge considered Bertin's initial claim for fraud premised on the

supposition that USS/Kobe, Kobe and USX owed a fiduciary duty to Bertin as partners or

apparent partners and failed in their duty to disclose that neither Kobe nor USX were

general partners of USS/Kobe, and in their duty to disclose the planned merger that

resulted in the spawning of RTI.  (R&R, p. 11).  The Magistrate Judge also considered

Bertin's argument that "because USS/Kobe fraudulently misrepresented itself as a

partnership between USX and Kobe" the plaintiff was forced into financial ruin.  (Id. at 12).

Upon review of the evidence, the Magistrate Judge found that Bertin and USS/Kobe, as a

matter of law, were not partners, were not joint venturers and did not have a fiduciary

relationship.  (R&R, pp. 13-18).  The Magistrate Judge found, further, that throughout their

business dealings with USS/Kobe, Bertin, and in fact, stood in relationship to the venture

as an acknowledged independent contractor.   As a logical and legal extension of those

findings, the Magistrate Judge recognized that Bertin could not establish a fiduciary

relationship with either USX or Kobe on the basis of Bertin's presumed partnership with

USS/Kobe.  Id.

Accordingly, the Magistrate Judge concluded that Bertin failed to introduce material

evidence on the issue of whether USS/Kobe had a duty to disclose the pending RTI

merger conversations prior to the final execution of the 1998 Agreement between

USS/Kobe and Bertin.  Instead, the R&R found no duty to disclose to Bertin that Kobe and

USX were not general partners of USS/Kobe or that they planned to merge USS/Kobe

with BarTech and Republic to create RTI.  The Magistrate Judge found that Bertin lacked

19

the reasonable legal basis upon which to establish a claimed fiduciary relationship with

Kobe, USX or USS/Kobe.  Any special confidence and trust that Bertin allegedly reposed

in those parties was misplaced, in light of the explicitly countervailing terms of the 1989

Agreement and the 1998 Agreement, and the fundamental presumption against finding a

fiduciary relationship between business associates, a presumption which Bertin was

unable to overcome.  See Interim Healthcare of Northeast Ohio, Inc. v. Interim Servs., Inc.,

12 F.Supp. 2d 703, 712 (1998) (citing Blon v. Bank One, Akron, N.A., 35 Ohio St. 3d 98,

101, 519 N.E. 2d 363 (1988)).  (R&R, pp. 13, 19).  Accordingly, the Magistrate Judge

properly concluded that Bertin did not produce evidence sufficient to enable a reasonable

jury to establish, as a matter of law, that a fiduciary relationship existed between it and

USS/Kobe, USX, Kobe, or KDI.  (R&R, p. 20).

  With regard to Bertin's second cause of action, for breach of fiduciary duty, the

Magistrate Judge concluded on the basis of its analysis of Bertin's fraud claim that

USS/Kobe did not owe a fiduciary duty to the plaintiff. (R&R 20).  Further, in an analysis of

the issue of whether Kobe, USX, or KDI should be liable, as partners, for the debts of the

USS/Kobe partnership, the Magistrate Judge thoroughly considered, and rejected, the

application of Colangelo v. Cashelmara Co., 1990 WL 180653 (Ohio App. Nov. 21, 1990),

as inapplicable to the instant matter where Bertin knowingly contracted away its right of

recovery in section 24.1 of the 1998 Agreement.[12]  Magistrate Judge Hemann properly

---

  [12]The R&R considers Colangelo's applicability in light of the Sixth Circuit's directive
in Pratt v. Brown Mach Co., 855 F.2d 1225, 1239 (6th Cir. 1986), that if "a state's highest
court has not spoken on a precise issue, a federal court, sitting in a diversity case, may not
disregard a decision of the state appellate court on point, unless it is convinced by other
persuasive date that the highest court of the state would decide otherwise."  The
Magistrate Judge grounded her rejection of Colangelo's applicability on four

recommended that the Court grant defendants' motions for summary judgment on Bertin's second cause of action for breach of fiduciary duty.

After thoroughly addressing Bertin's waiver of defendants' liability in the non-recourse provision, section 24.1, of the 1998 Agreement, Magistrate Judge Hemann reasoned the provision bars Bertin from bringing a claim "against the general partners of USS/Kobe or any of USS/Kobe's affiliates, employees, officers, director or owners in connection with USS/Kobe's obligations." (R&R, p. 26).  As such, section 24.1 effectively bars Bertin from successfully maintaining its third cause of action for apparent partnership liability against Kobe, USX and KDI.  The Magistrate Judge properly recommends the Court grant summary dismissal of the claim.

**C.     Bertin's Objections to the Magistrate Judge's Report.**

**(i) Objection: The R&R did not address Bertin's "affirmative misrepresentation" claim.**

In response to the Magistrate Judge's R&R, Bertin first objects that its fraud claim was based not only on the failure to disclose material facts – that USS/Kobe had a duty to disclose the potential RTI transaction to Bertin – but was also predicated on the "affirmative misrepresentation" that USX and Kobe were the actual partners of USS/Kobe. Such an "affirmative misrepresentation," Bertin insists, induced it to agree to the 1998

─────────────────────

considerations: Ohio law was not at play in Colangelo; the Eighth District Court of Appeals has since retreated from its decision in Colangelo in Prudential Ins. Co. of Am. V. Science Park Ltd. P'ship, 106 Ohio App. 3d 823, 667 N.E. 2d 437 (1995); other Ohio appellate courts implicitly recognize the right of partners to alter their statutory liability through contract; the Ohio legislature has not barred waiver of a partner's liability for the obligations of the partnership, suggesting it does not violate public policy.  (R&R 23, 24).

Agreement, which restructured its relationship with USS/Kobe to the plaintiff's detriment. (Bertin Obj., pp. 6-8).

As evidence of this "affirmative misrepresentation," Bertin points to several events or series of events.  First, Bertin's willingness to encumber itself with the additional costs and expenses associated with the Wickliffe Crane Center.  Second, its reasonable reliance on statements made by Joe Kaczka, of USS/Kobe, during a discussion of the non-recourse provision, section 24.1, of the 1998 Agreement.  Third, the developing ten-year business relationship between Bertin and USS/Kobe, and fourth, the press releases made by both USX and Kobe regarding their relationship to USS/Kobe.

Upon review, the Court finds Magistrate Judge Hemann's report and recommendation clearly, and thoroughly, addressed the issue of affirmative misrepresentation.  Indeed, Bertin acknowledges, in its Objections, that the R&R specifically considered the very evidence it now puts forth as material to the issue of affirmative misrepresentation.  (Bertin Obj., p. 7).

The R&R explicitly considered Bertin's proposition regarding affirmative misrepresentation, that "USX, Kobe, and USS/Kobe knew that if Bertin had known that USX and Kobe were not general partners of USS/Kobe that Bertin would not have entered into the 1998 Agreement or assumed the debt required to fulfill its responsibilities under that agreement."  (R&R, pp. 11-12).  After concluding that Bertin was unable to provide material facts to show that the parties were partners, joint venturers or fiduciaries, as was necessary to establish that Kobe and USX had a duty to disclose that they were not partners, the R&R recommends that the Court grant defendants' motion as to Bertin's cause of action as to fraudulent misrepresentation.  (R&R p. 20).  The Court agrees,

22

neither Kobe, KDI, nor USX had a duty to disclose they were not partners of USS/Kobe.[13]

Anchor v. O'Toole, 94 F.3d 1014, 1024 (6th Cir. 1996) (finding that for a fiduciary duty to

arise from an informal relationship, such as the one at hand, both parties must understand

that a special trust or confidence has been reposed).

The result is no different if Kobe or USX affirmatively stated they were partners of

USS/Kobe.[14]  Bertin did not have the necessary relationship to either party that would

warrant the Court in finding the establishment of a duty.  Morever, to conclude otherwise

would lead to an irrational result.  Even if the evidence indicated that Kobe and USX were

partners of USS/Kobe, nevertheless, pursuant to section 24.1 of the 1998 Agreement,

Bertin was precluded from initiating an action against either defendant for the debts and

obligations of USS/Kobe.  Thus, if accepted, Bertin's argument results in the unreasonable

result that if Kobe and USX were partners of USS/Kobe they would not be liable, while if

they affirmatively represented themselves as partners when they were, in fact, not, then

they would be liable.  Such a result is legally untenable.

---

[13]Moreover, Bertin provides neither evidence nor argument to substantiate its, seemingly retrospective, claim that it entered into the 1998 Agreement only because it thought USX and Kobe were the actual partners of USS/Kobe.  Bertin provides no evidence that it sought agreements or assurances from USS or Kobe, nor does it attempt to explain why it waived any claims against USX and Kobe under section 24.1 of the 1998 Agreement, if it were specifically relying on what it presumed were those partners' relationship with USS/Kobe.

[14]As the Magistrate Judge indicated in her R&R, whether the fraud is one of omission or commission, the standard remains the same, requiring (1) an intentional or a negligent (2) false representation or failure to speak (3) on which the recipient reasonably relied (4) to his or her loss.  Craggett v. Adell Ins. Agency, 92 Ohio App. 3d 443, 450, 635 N.E. 2d 1326, 1331 (1993).  (R&R, p. 12).

In addition, as Bertin makes clear in its several pleadings, any reliance it had upon the presumed general partnership of USX and Kobe to USS/Kobe was not a reliance upon those defendants' status as partners, per se, but upon their financial resources to which Bertin might have recourse.[15]  Bertin, however, provides no material evidence that such a reliance was reasonable.  Indeed, clear evidence argues otherwise, where Bertin contracted away any recourse it might have had against the partners for such financial support in section 24.1 of the 1998 Agreement.  See Columbia Gas Transmission Corp. V. Ogle, 51 F. Supp. 2d 866, 873 (S.D.Ohio 1997); Marion Production Credit Assn. V. Cochran, 40 Ohio St. 3d 265, 274-75 (1988).[16]

**(ii) Objection: The R&R did not address Bertin's alter ego claim.**

Bertin has also objected to the Magistrate Judge's treatment of its fraud claim in relation to its allegation that USX, KDI, and Kobe were the alter egos of USS Holding and Kobe Lorain and thus liable to Bertin for an alleged breach of fiduciary duty.  (Bertin Obj., pp. 8-17).  Bertin maintains "the Magistrate Report completely failed to address the alter

---

[15]For example, Bertin states in its memorandum in opposition to summary judgment that it "rightfully believed that USS/Kobe's partners had $34.6 billion in annual sales and would financially support their partnership if necessary."  (Bertin Opp., p. 18).

[16]Whether Bertin reasonably relied upon alleged misrepresentations where the parties entered into a written agreement that was contrary to those representations is not a question of fact for the jury.  As a matter of law, a party to a contract claiming fraud cannot justifiably rely on oral representations that are contrary to the terms of the written agreement.  See R.J. Wildner Contracting Co., Inc, v. Ohio Turnpike Com., 913 F. Supp. 1031 (N.D. Ohio 1996)(finding as a matter of law that plaintiff could not have justifiably relied on alleged misrepresentations which were contrary to the written agreement. Accord Cook v. Little Ceasar Enterprises, Inc., 210 F.3d 653, 658 (6th Cir. 2000) (affirming summary judgment where reliance upon oral representations, even if false, is unreasonable if the party enters into a subsequent agreement).

24

ego issue," which raises a genuine issue of material fact.  Id. at 8.  Bertin represents

specifically, that "[i]f USS/Kobe engaged in fraud by inducing Bertin's execution of the

1998 Processing Agreement, based upon a misrepresentation that USX and Kobe were

partners comprising USS/Kobe, then its partners USS Lorain Holding Company and

Kobe/Lorain, Inc. are jointly and severally liable for that fraud [and] USX and Kobe are . . .

liable for the fraud" as alter egos of USS Holding and Kobe Lorain.  (Id. at 8).  Bertin sets

forth an extensive presentation of each element required to pierce the corporate veil of

USS Lorain Holding and Kobe Lorain.

Contrary to Bertin's assertion, the Magistrate Judge's Report expressly addressed

Bertin's concerns at the outset of its analysis regarding Bertin's fraud claim.  The R&R

noted that Bertin "seeks damages from USX, Kobe and KDI as alter egos of the former

general partners of USS/Kobe . . ."  (R&R at p. 12).  See also R&R at p. 3 ("Bertin further

contends that USX fully controlled and was the alter ego of USS Lorain and that Kobe fully

controlled and was the alter ego of KDI and Kobe/Lorain).

No further need existed for the Magistrate Judge's Report to address the alter ego

issue now resurrected by Bertin, because the predicate condition for such an examination

rests solely upon the grounds that USS/Kobe be found liable for fraud.  Indeed, Bertin

acknowledges that very condition precedent in framing its objection.  (Bertin Obj., p. 8).

Because the Magistrate's Report properly found that Bertin could not support the

underlying fraud claim no further interrogation of the alter ego issue was warranted and the

25

Magistrate Judge properly found that neither USX, Kobe nor KDI breached a fiduciary duty owed to Bertin.[17]


      **(iii) Objection:  The R&R misapplied section 24.1 to Bertin's tort claims.**


      In its third and fourth objections to the Magistrate Judge's Report, Bertin maintains that the non-recourse provision, section 24.1, of the 1998 Agreement was misconstrued. (Bertin Obj., pp. 18-22).  The Magistrate's Report concluded that section 24.1 bars Bertin's cause of action for breach of fiduciary duty and for apparent partnership liability because it precluded Bertin from instituting an action against the general partners of USS/Kobe or any of its affiliates or owners in connection with USS/Kobe's obligations.  (R&R, pp. 20-26).

      In its third objection, Bertin contends the non-recourse provision, section 24.1 of the 1998 Agreement, by its terms, only forecloses contractual enforcement against the general partners and affiliates; but does not foreclose tort liability for fraud.  Bertin further argues that under Ohio law a contractual disclaimer found in a contract induced by fraud cannot be enforced to bar recovery for fraud and deceit, relying on <u>Niehaus v. Haven Park West, Inc.</u>,

---

    [17]Even if Bertin had established a valid claim of fraud, piercing the corporate veil is an "extraordinary remedy" which is employed only under "extraordinary circumstances." <u>E.S. Preston Assoc., Inc. V. Preston</u>, 24 Ohio St. 3d 7, 11 (1986).  In this instance, Bertin has not shown evidence material to addressing the required elements for liability under the alter ego doctrine: that (1) Kobe or USX controlled USS/Kobe such that USS/Kobe had no separate mind, will or existence of its own; (2) Kobe and USX controlled USS/Kobe in such a manner as to commit fraud; and (3) injury and unjust result occurred as a proximate cause of such control. <u>Belvedere Condominium Unit Owners' Assn v. R.E. Roark Companies, Inc</u>., 67 Ohio St. 3d 274, 289 (1993), following <u>Bucyrus-Erie Co. V. General Products Corp.</u>, 643 F.2d 413 (6th Cir. 1981).

2 Ohio App. 3d 24, 25 (1981) and Sanfillipo v. Rarden, 24 Ohio App. 3d 164, 168 (1985). (Bertin Obj., pp. 17, 19).

As an initial matter, both the Magistrate Judge's Report and the record evidence are clear that section 24.1 does cover Bertin's damages as alleged in its Second Amended Complaint.  Bertin seeks to recover from Kobe and USX those damages it presumably suffered when RTI failed to perform under the contract.  As such, Bertin seeks contractual damages not tort damages.  Those damages are clearly anticipated in section 24.1 as "liabilities and obligations . . . under the Agreement or relating to the work . . ." that can only be recovered against the assets of USS/Kobe in accordance with the agreed contract. (R&R, pp. 7, 8).

Accordingly, Bertin is not seeking to rescind the contract but, rather, is seeking the termination fee specified in the 1998 Agreement.  Because Bertin elected to accept the 1998 Agreement and to seek damages under its terms, it cannot now avoid its unequivocal limitations, but must accept the bargain whole.[18]  See Jeffrey Mining Products, Ltd. V. Left Fork Mining Co, 143 Ohio App. 3d 708, 716 (2001) ( finding that plaintiff, having elected to accept the contract and seek damages, was bound by the terms of the contract, including the one year limitation period that the court found to bar its fraudulent inducement claims).  Moreover, pursuant to clear Ohio law, the damages attributable to

---

[18]The Magistrate Judge recognized, with regard to the equity of this bargain, that the dispute does not involve one party entirely at the mercy of the other, observing: "As Bertin points out, rather than entering into the 1998 Agreement, it could have abandoned its relationship with USS/Kobe and downsized its operation.  Further, both parties were experienced business entities having the assistance of counsel.  This is not a case in which one party was a naif whose lack of sophistication was exploited by the other party." (R&R at p. 25, n. 10).

any alleged tortious conduct must be in addition to, and distinct from , those attributable to the breach of contract.  Textron Financial Corp. v. Nationwide Mutual Ins. Co., 115 Ohio App. 3d 137, 684 N.E. 2d 1261 (1996).  Here, Bertin seeks damages arising from the 1998 Agreement, and makes no claim for damages independent of that contract.

Additionally, Bertin's reliance on Sanfillipo v. Rarden, supra, is misplaced. Sanfillipo deals with the issue of whether a contractually imposed limitation of liability was enforceable to preclude a fraud claim based on representations that where not incorporated into the agreement and not separately reduced to writing.  In this instance, however, the alleged misrepresentations are incorporated into and directly contradictory to the 1998 Agreement.  Similarly, Bertin's reliance on  Bank of Montreal v. Signet Bank, supra, is inapposite.  Bank of Montreal, like R.J. Wildner Contracting Co., Inc, supra, stands for the proposition that Bertin cannot, as a matter of law, rely on alleged misrepresentations that were contrary to the disclaimer contained in the contract.  Any reliance, by Bertin on alleged misrepresentations that Kobe and USX were partners in liability with USS/Kobe is, thus, legally unreasonable in light of the terms of section 24.1 of the 1998 Agreement.

As part of this objection, which amounts to an effort to challenge the legal reach of the non-recourse provision, Bertin further maintains that section 24.1 does not constrain its damages claims because those damages are no longer subsumed in the "USS/Kobe Obligations."  Bertin contends that "the remaining liabilities relating to the 1998 Processing Agreement were no longer "USS/Kobe Obligations" [under the 1998 Agreement] and became "direct obligations of Kobe and USX."  (Bertin Obj., p. 18).  If Bertin means to suggest that section 24.1 no longer applies subsequent to the merger of USS/Kobe, et al.

into RTI, then the argument is meritless.  The fact that USS/Kobe was dissolved by operation of law is irrelevant.  The claims are still in connection with the "USS/Kobe Obligations" because, pursuant to section 23 of the 1998 Agreement, the terms of the contract inured to the benefit of any and all successors and assigns, including RTI which explicitly took assignment of the 1998 Agreement in August 1999.  Accordingly, neither USX nor Kobe are liable for RTI's liabilities and obligations whether RTI is considered a successor or assignee of the 1998 Agreement.

### (iv) Objection: The R&R misapplied section 24.1 to Bertin's apparent partnership claim.

In its fourth objection, Bertin maintains the Magistrate Judge's R&R misapplied section 24.1 to bar Bertin's "partnership by estoppel" claims.  (Bertin Obj., pp. 19-22).  Bertin maintains that actions by Kobe and USX to represent themselves as partners of USS/Kobe induced Bertin to rely on those representations to its detriment, a consideration left unaddressed by the R&R.  In mounting this charge, Bertin relies upon Ohio Revised Code, section 1775.15, which considers the boundaries of apparent partnership:

> Subject to section 1339.65 of the Revised Code, when a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to anyone, as partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made who has, on the faith of such representation, given credit to the actual or apparent partnership, and if he has made such representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made.

O.R.C. § 1775.15.

29

Bertin's gambit to reintroduce its apparent partnership liability claim through a discussion of O.R.C. § 1775.15, fails, as a matter of law, for several reasons.  First, Ohio courts have resisted applying the doctrine of partnership by estoppel set forth in § 1775.15 to fraud, breach of fiduciary duty or similar tort claims.  The two Ohio cases cited in Bertin's brief in Opposition to the Magistrate Judge's R&R – Brown & Bigelow v.Roy, 132 N.E. 2d 755 (Ct. App. 10th 1955) and Fiberized Products Inc. v. Crocker, 1993 WL 120092 (Ct. App. 10th 1993) – sound in contract not tort.[19]  Moreover, in Greiner v. Perry, 13 Ohio Law Abs. 688, 1933 WL 1360 (Clark Cty. App. 1933), the Court affirmed the limited applicability of the doctrine of partnership by estoppel, noting that "what might be sufficient to estop persons from denying a partnership in a case of contract is wholly different from showing liability in a case of tort."  Id. at *2.

Second, the statute requires that damages inure only to an entity who, believing a partnership exists, actually "give[s] credit to the actual or apparent partnership."  O.R.C. § 1775.15.  Pursuant to Fiberized Products, Inc, supra, giving credit strictly refers to providing financial credit, where the claimant has advanced the apparent partner an allowance of time in which to make a payment, thus enabling the deferment of payment.  Bertin would have this Court construe the definition of "giving credit" broadly, as akin to

---

[19]Bertin's reliance upon a third Ohio case, Estate of Holmes v. Ludeman, 2001 WL 1198638 (Lucas Cty. App. 2001), for the proposition that the doctrine of partnership by estoppel has been applied in tort cases involving fraud is misapplied.  Claims in Ludeman involved the application of the doctrine in a malpractice context.  Contrary to Bertin's implication, the Court neither approved the doctrine in malpractice cases, nor did the Court reach the issue of the doctrine's application to the claims.  Rather, the Court overturned the trial court's award of summary judgment in favor of the alleged apparent partner and remanded the case on the grounds that there was a genuine issue of fact on whether there was an apparent partnership under the statute.  Such an outcome is not an application.

detrimental reliance, which this Court must refuse, in light of the fact that express Ohio

authority is to the contrary of such a capacious reading.[20]

This Court is not persuaded that O.R.C. § 1775.15 merits any application in this

instance, and finds, in concert with the Magistrate Judge's Report, that section 24.1 of the

1998 Agreement bars Bertin's apparent partnership claim against Kobe, USX and KDI.

**D.     Defendants' Counter-Claims**

Finally, the Court affirms the Magistrate Judge's denial of the defendants Kobe,

KDI, and USX's motions for summary judgment on their counter-claims against Bertin.  The

defendants have filed no objections to the R&R's conclusion that section 24.1 of the 1998

Agreement was not a covenant against suit, but rather, established the parties' relationship

and Bertin's limited recourse at the law.  Accordingly, the Court denies those counter-

claims.

---

[20]Bertin relies on New York and Illinois cases to build its claim, which in the face of contrary Ohio state decisions, cannot guide this Court's hand.  See Sitchenko v. DiResta, 512 F.Supp. 758 (E.D.N.Y. 1981); Manning v. Crockett,1999 WL 342715 (N.D. Ill May 18, 1999).

**V.  CONCLUSION**

For the reasons set forth above, defendants Kobe, KDI, and USX's motions for summary judgment against plaintiff Bertin's claims are granted in their entirety. Defendants' motions for summary judgment on their counter-claims are denied. Accordingly, all three of plaintiff's claims are dismissed, as are all of defendants' counter-claims.


IT IS SO ORDERED.

                                         /s/ Lesley Wells
                                   UNITED STATES DISTRICT JUDGE


Dated: 6 September 2005

32